1
2
3
4
5
6
7                    IN THE UNITED STATES DISTRICT COURT

8                FOR THE NORTHERN DISTRICT OF CALIFORNIA

9                        SAN FRANCISCO DIVISION

10

GENETIC TECHNOLOGIES LIMITED,          No. CV 12-01616  RS
11   an Australian corporation,

12                                         **ORDER DENYING DEFENDANT'S**
                                        **MOTION TO DISMISS**
              Plaintiff,
13
         v.
14
AGILENT TECHNOLOGIES, INC.,
15   a Delaware corporation,

16
              Defendant.
17   _____/

18

19                         I.    INTRODUCTION

20        Plaintiff Genetic Technologies Limited ("GTG") brings this action for infringement of U.S.

21   Patent No. 5,612,179 ("the '179 patent") against defendant Agilent Technologies, Inc.  Agilent

22   moves to dismiss plaintiff's Second Amended Complaint ("SAC") under Rule 12(b)(6) of the

23   Federal Rules of Civil Procedure, arguing the '179 patent claims an unpatentable law of nature.

24   Although the '179 patent does embrace a law of nature, defendant's motion to dismiss must be

25   denied, because Agilent has not shown by clear and convincing evidence that the patent does not

26   claim meaningfully limited applications of that natural law.

27

28

**United States District Court**
For the Northern District of California

II.   BACKGROUND

A.   Procedural History

On May 25, 2011, GTG filed a complaint asserting infringement of the '179 patent against multiple defendants, including Agilent, in the District Court of Colorado.  Agilent, like many of the other defendants in the case, moved to dismiss the complaint and sever plaintiff's claims against them.  Following an initial Rule 16 conference and some preliminary motion practice on discovery matters, the court granted defendants' respective motions to sever plaintiff's claims, and transferred the resulting cases to various venues around the country.  The court denied defendants' remaining motions to dismiss as moot.

On March 28, 2012, GTG filed its First Amended Complaint in this district.  (ECF No. 2). Agilent moved to dismiss and GTG moved to stay the proceedings pending resolution of a multi-district litigation (MDL) motion to transfer and consolidate the case.  (ECF No. 20; ECF No. 21). A previous order granted GTG's motion to stay and denied without prejudice Agilent's motion to dismiss.  (ECF No. 37).  The MDL panel denied GTG's motion to centralize its various infringement actions, but the case was once again stayed pending an *ex parte* reexamination of the '179 patent.[1]  (ECF No. 41; ECF No. 45).

Following the completion of the reexamination, GTG filed its Second Amended Complaint (SAC) on December 5, 2013.  (ECF No. 65).  The SAC alleges that Agilent directly infringed or induced infringement of claims 1–13 and 15–18 of the '179 patent.[2]  Agilent now moves to dismiss GTG's complaint, arguing the '179 patent claims non-patentable subject matter under 35 U.S.C. § 101.  (*See* ECF No. 67).  In particular, Agilent contends the claims cover natural phenomena or laws of nature that are not entitled to patent protection.  *Id.* at 1–4.

---

[1] The *ex parte* reexamination was initiated by Merial L.L.C., a defendant accused of infringing the patent-in-suit in another action, which is currently pending in the District of Delaware.  (*See* ECF No. 45).

[2] The '179 patent expired on March 9, 2010.  GTG seeks damages for past infringement that occurred between March 25, 2005 and March 9, 2010.  (*See* SAC at ¶ 44).

B.      Technology at Issue

This case involves technology related to deoxyribonucleic acid (DNA).  (SAC at ¶ 7).  The Supreme Court recently provided the following background on DNA:

> Genes form the basis for hereditary traits in living organisms. . . .  The human genome consists of approximately 22,000 genes packed into 23 pairs of chromosomes.  Each gene is encoded as DNA, which takes the shape of the familiar "double helix" that Doctors James Watson and Francis Crick first described in 1953.  Each "cross-bar" in the DNA helix consists of two chemically joined nucleotides. . . .  Sequences of DNA nucleotides contain the information necessary to create strings of amino acids, which in turn are used in the body to build proteins.  Only some DNA nucleotides, however, code for amino acids; these nucleotides are known as "exons."  Nucleotides that do not code for amino acids, in contrast, are known as "introns."

*Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 133 S. Ct. 2107, 2111 (2013).  An "allele" is a genetic variation associated with a coding region.  ('179 patent, SAC, Ex. A, at 5:17–19).  Groups of alleles may be inherited as a unit; these groups are sometimes referred to as haplotypes. *Id.* at 5:33–39.  Because the presence of these variations in the coding region may be associated with particular traits or diseases, it can be useful to detect whether certain alleles or haplotypes are present in an individual.  (SAC at ¶ 9).

Prior to the '179 patent, the scientific community largely ignored as irrelevant the non-coding DNA regions, i.e. introns.  *Id.* at ¶ 15.  The inventors of the '179 patent, however, discovered that variations in intron regions may be linked or correlated to the presence of alleles in the coding regions.[3]  *Id.* at ¶ 16.  Generally speaking, the '179 patent is directed at claimed methods for analyzing variations in non-coding intron sequences to detect linked coding region alleles and haplotypes.  (SAC at ¶ 36; '179 patent at 4:27–29).  More specifically, the '179 patent claims methods involving "amplifying genomic DNA with a primer pair that spans a non-coding region sequence" and then "analyzing the amplified sequence to detect the allele."  (SAC at ¶ 26; '179 patent at 59:59–65).

---

[3] GTG refers to this phenomenon as "linkage disequilibrium."  The '179 patent provides: "The term 'Linkage disequilibrium', as used herein, refers to the co-occurrence of two alleles at linked loci such that the frequency of the co-occurrence of the alleles is greater than would be expected from the separate frequencies of occurrence of each allele."  ('179 patent at 5:25–30).

United States District Court

For the Northern District of California

### III.    LEGAL STANDARD

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). While "detailed factual allegations are not required," such a complaint must have sufficient factual allegations to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly*, 550 U.S. at 556–67). Such a determination is a context-specific task requiring the court "to draw on its judicial experience and common sense." *Id.* at 1950. A claim may be dismissed under Federal Rule of Civil Procedure 12(b)(6) based on the "lack of a cognizable legal theory" or on "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). When evaluating such a motion, the court must accept all material allegations in the complaint as true, even if doubtful, and construe them in the light most favorable to the non-moving party. *Twombly*, 550 U.S. at 570. "Conclusory allegations of law and unwarranted inferences of fact do not suffice to support a claim." *Bradley v. Chiron Corp.*, 136 F.3d 1317, 1322 (Fed. Cir. 1998).

"[I]f Rule 12(b)(6) is used to assert an affirmative defense, dismissal is appropriate only if the well-pleaded factual allegations in the complaint, construed in the light most favorable to the plaintiff, suffice to establish the defense." *Ultramercial, Inc. v. Hulu, LLC*, 722 F.3d 1335, 1338–39 (Fed. Cir. 2013). The affirmative defense of patent ineligibility due to unpatentable subject matter must be established by clear and convincing evidence, because every patent is presumed to be properly issued. *Id.* at 1342, 1338–39 ("[T]he only plausible reading of the patent must be that there is clear and convincing evidence of ineligibility."). The Federal Circuit has cautioned that "Rule 12(b)(6) dismissal for lack of eligible subject matter will be the exception, not the rule." *Id.*

### IV.    DISCUSSION

Section 101 of the Patent Act defines patent eligible subject matter to include "any new and useful process, machine, manufacture, or composition of matter, or any new and useful

United States District Court

For the Northern District of California

improvement thereof[.]"  35 U.S.C. § 101 (2012); *Bilski v. Kappos*, 130 S. Ct. 3218, 3225 (2010).

Although the statute describes patentable subject matter in expansive terms, "[t]he [Supreme]

Court's precedents provide three specific exceptions to § 101's broad patent-eligibility principles:

'laws of nature, physical phenomena, and abstract ideas.'"  *Bilski*, 130 S. Ct. at 3225 (quoting

*Diamond v. Chakrabarty*, 447 U.S. 303, 309 (1980)).  "These are the basic tools of scientific and

technological work, and therefore, if patented, would stifle the very progress that Congress is

authorized to promote."  *Id.* at 3253 (internal quotations and citations omitted).

At the same time, the Court has recognized that "too broad an interpretation of this

exclusionary principle could eviscerate patent law.  For all inventions at some level embody, use,

reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas."  *Mayo*

*Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1293 (2012).  Thus the Court has

stated, "while an abstract idea, law of nature, or mathematical formula [may] not be patented, 'an

*application* of a law of nature or mathematical formula to a known structure or process may well be

deserving of patent protection.'"  *Bilski*, 130 S. Ct. at 3230 (quoting *Diamond v. Diehr*, 450 U.S.

175, 187 (1981)) (emphasis original).  "[T]o transform an unpatentable law of nature into a patent-

eligible *application* of such a law, one must do more than simply state the law of nature while

adding the words 'apply it.'"  *Prometheus*, 132 S. Ct. at 1294 (emphasis original).  Rather, a

claimed "process that focuses upon the use of a natural law [must] also contain other elements or a

combination of elements, sometimes referred to as an 'inventive concept,' sufficient to ensure that

the patent in practice amounts to significantly more than a patent upon the natural law itself."  *Id.*

Agilent argues the '179 patent claims a law of nature.  According to Agilent, the patent

contains nothing more than the idea that variations in non-coding regions of DNA may be

correlated to variations in coding regions.  (*See* ECF No. 71 at 17).  To the extent the patent claims

attempt to limit the invention to specific applications, Agilent maintains the limitations were known

and practiced in the art and amount to nothing more than instructions to apply the natural law.  *Id.*

at 18–20.  GTG concedes that any specific correlation between variations in non-coding and coding

DNA regions is "naturally occurring."  (ECF No. 75 at 13).  GTG argues, however, that these

correlations are not laws of nature, because they are not universal, i.e. not "immutable scientific truth[s]." *Id.* at 13–14. Rather, the correlations are present in only some species or some individuals within a species, and may change over time through evolutionary processes.[4] GTG further argues the '179 patent claims are directed to "specific, limited, and unconventional methods" for exploiting these correlations. *Id.* at 14. These arguments are addressed in turn.

A.    Law of Nature

The correlations between genomic variation in non-coding and coding regions of DNA are unpatentable laws of nature. In *Prometheus*, the Supreme Court held that relationships between concentrations of certain metabolites in the blood and the likelihood that a dosage of a thiopurine drug would prove ineffective or cause harm were laws of nature. 132 S. Ct. at 1296. The Court stated: "The relation is a consequence of the ways in which thiopurine compounds are metabolized by the body—entirely natural processes. And so a patent that simply describes that relation sets forth a natural law." *Id.* at 1297. Nothing in the Court's reasoning requires or even suggests that a correlation must be present in all species, all individuals within a species, or be unchanging over time to be a natural law.[5] Rather, all *Prometheus* requires is the correlation be the product of entirely natural processes. GTG concedes that the correlations between genomic variation in non-coding and coding regions are naturally occurring. (ECF No. 75 at 13). The correlations themselves are therefore natural laws under *Prometheus*.

B.    Inventive Concept

The more difficult question is whether the '179 patent claims contain sufficient "inventive concept" to transform an unpatentable natural law into a patentable application of that law. Because this question requires more factual development and potentially construction of the claims, Agilent's Rule 12(b)(6) motion must be denied. *See Ultramercial*, 722 F.3d at 1339–40 (noting §

---

[4] Agilent contends that GTG disclaimed these arguments during prosecution and reexamination of the '179 patent and are therefore precluded from raising them here. (*See* ECF No. 78 at 4–7). Because the distinctions GTG offers are not relevant, Agilent's arguments need not be addressed.

[5] GTG provides no support for its position that a law of nature must be an "immutable scientific truth."

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1    101 analysis is "rife with underlying factual issues" and often requires claim construction, which

2    generally renders dismissal under Rule 12(b)(6) improper).[6]

3          *Prometheus*' inventive concept analysis requires a claim contain additional limiting steps

4    beyond the natural law itself.  While the Supreme Court has not prescribed a specific test to

5    determine what constitutes sufficient inventive concept, it has made clear that the additional steps

6    must be more than "well-understood, routine, conventional activity already engaged in by the

7    scientific community[.]"  *Prometheus*, 132 S. Ct. at 1298.  To make this determination, the claims

8    must be considered as a whole.  *Diehr*, 450 U.S. at 188.  "This is particularly true in a process claim

9    because a new combination of steps in a process may be patentable even though all the constituents

10   of the combination were well known and in common use before the combination was made."  *Id.*

11         The parties dispute whether the additional steps described in the '179 patent—namely the

12   use of a primer pair to amplify a non-coding intron sequence— amount to well-understood, routine,

13   or conventional techniques at the time the patent was filed.[7]  Agilent argues the prior art disclosed

14   in the '179 patent specification demonstrates the amplification steps are not novel.[8]  (ECF No. 75 at

15   18–19).  It further contends GTG conceded during prosecution that the "[a]pplicant has not

16   invented a new way to analyze genetic loci[,]" but rather applied known prior art techniques to non-

17

18   _____

[6] Agilent relies on several district court decisions to argue courts routinely find patent claims
19   ineligible at the pleading stage without fact finding or claim construction.  (ECF No. 71 at 13; ECF
     No. 78 at 12).  To the extent these decisions predate *Ultramercial*, they may not reflect the Federal
20   Circuit's understanding of the patent eligibility inquiry on a Rule 12(b)(6) motion.  To the extent
     these decisions apply *Ultramercial* to find patent claims ineligible, they are the exception, not the
21   rule.  *See Lumen View Tech. LLC v. Findthebest.com, Inc.*, 13 CIV. 3599 DLC, 2013 WL 6164341,
     at *15 (S.D.N.Y. Nov. 22, 2013) ("[I]t will be rare that a patent infringement suit can be dismissed
22   at the pleading stage for lack of patentable subject matter . . . .  But rare does not mean never.").

23   [7] Both independent claim 1 and independent claim 9 require primer pair amplification.  ('179 patent
     at 59:55–67, 60:17–27).

24   [8] Agilent relies on a recent decision in this district which found that similar amplification
     techniques were routine activities practiced by those in the field.  *See Ariosa Diagnostics, Inc. v.*
25   *Sequenom, Inc.*, C 11-06391 SI, 2013 WL 5863022, at *8 (N.D. Cal. Oct. 30, 2013).  At this early
     juncture, *Sequenom* is inapposite.  Importantly, the court's finding was made on a motion for
26   summary judgment where the district court relied on evidence beyond the pleadings, including
     expert testimony.  *See id.*  Moreover, the patentee in *Sequenom* conceded that the patent at issue
27   merely applied "conventional techniques" to a natural phenomenon.  *Id.* ("Sequenom does not
     contest that these [amplification] steps and other steps in the patent were well-understood, routine,
28   and conventional activity by those in the field at the time of the invention.").

United States District Court
For the Northern District of California

coding introns.[9]  *Id.* at 19.  Agilent's arguments conflate the analysis of patent eligible subject matter under § 101 with analysis of novelty and non-obviousness under §§ 102 and 103.  *See Diehr*, 450 U.S. at 188–89 ("The 'novelty' of any element or steps in a process, or even of the process itself, is of no relevance in determining whether the subject matter of a claim falls within the § 101 categories of possibly patentable subject matter."); *Ultramercial*, 722 F.3d at 1347 (noting that although the "routine" and "conventional" inquiries "require an understanding of what existed in the ken of those skilled in the art during the relevant time frame, principles of patent eligibility must not be conflated with those of validity[.]").

Rather than novelty or non-obviousness, the Supreme Court's analysis of inventive concept has focused on whether the additional steps limit the claims to a particular application or whether the claims preempt the use of the natural law.  *See Prometheus*, 132 S. Ct. at 1298–1300; *Ultramercial*, 722 F.3d at 1348 ("[T]he Supreme Court's reference to 'inventiveness' in *Prometheus* can be read as shorthand for its inquiry into whether implementing the abstract idea in the context of the claimed invention inherently requires the recited steps.").[10]  Although recent case law displays difficulty characterizing the exact contours of the inventive concept analysis,[11] the

---

[9] Agilent maintains that GTG cannot now argue its methods are "novel and unconventional" because they are bound by these conflicting prosecution statements.  (ECF No. 78 at 5–7.)  GTG's statements are not necessarily inconsistent.  The '179 patent authors conceded during prosecution that they did not invent genomic amplification using a primer pair.  The application of primer pair amplification to intron sequences, however, may well have been "novel and unconventional."  As discussed herein, whether those in the field would consider applying genomic amplification to non-coding regions conventional or routine is a factual question better addressed at a later stage.

[10] Supreme Court precedent does not distinguish between the abstract idea and law of nature exceptions for purposes of the inventive concept inquiry.  For example, *Prometheus*, a law of nature case, relied on *Bilski*, an abstract idea case, to support the conclusion that the patent claim did not contain sufficient inventive concept.  *See Prometheus*, 132 S. Ct. at 1300.

[11] The Federal Circuit's recent en banc decision in *CLS Bank Int'l v. Alice Corp. Pty. Ltd.* affirmed the district court's finding that the patent at issue claimed an unpatentable abstract idea.  717 F.3d 1269, 1273 (Fed. Cir. 2013) cert. granted, 134 S. Ct. 734 (2013).  The Federal Circuit's reasoning, however, fractured into five separate opinions.  One judge noted:

> Although a majority of the judges on the court agree that the method claims do not recite patent eligible subject matter, no majority of those judges agrees as to the legal rationale for that conclusion.  Accordingly, though much is published today discussing the proper approach to the patent eligibility inquiry, nothing said today beyond our judgment has the weight of precedent.

*Alice*, 717 F.3d at 1292 n.1 (Rader, J., concurring-in-part).

**United States District Court**
For the Northern District of California

1  Federal Circuit has offered some guidance.  In *Ultramercial*, the Federal Circuit described the

2  relevant inquiry as "whether a claim, as a whole, includes *meaningful* limitations restricting it to an

3  application[.]"  722 F.3d at 1344 (emphasis original).

4       The Federal Circuit described several considerations which indicate whether a claim is

5  meaningfully limited;  specifically, whether the claim (1) preempts all practical applications of a

6  natural law, (2) contains only insignificant pre- or post-solution activity, (3) provides no real

7  direction, i.e. the limitations are overly-generalized, or (4) requires a particular machine

8  implementing a process or a particular transformation of matter.[12]  *Id.* at 1345–67.  As noted above,

9  because every patent is assumed to be properly issued, there must be clear and convincing evidence

10  the claims are not meaningfully limited to find a patent covers ineligible subject matter.  *See id.* at

11  1342, 1338–39.

12            1.    Preemption

13       There is not clear and convincing evidence the asserted claims of the '179 patent preempt all

14  practical application of the natural law.  A patent claim is not meaningfully limited where it

15  effectively grants a monopoly over all uses of a natural law.  *See id.* at 1345–46; *see also*

16  *Prometheus*, 132 S. Ct. at 1299–300 (noting claim steps that must have been taken to use the law in

17  question simply told doctors to "apply the law").

18       Agilent's preemption arguments focus on GTG's statements during patent prosecution that

19  the naturally occurring correlations have wide applicability.  (*See* ECF No. 71 at 21–22).  These

20  arguments confuse the scope of the natural law with the scope of preemption of the patent's claims.

21  *See Ultramercial*, 722 F.3d at 1346 ("It is not the breadth or narrowness of the abstract idea that is

22  relevant, but whether the claim covers every practical application of that abstract idea.").  The

23  natural law at issue here—that variations in intron sequence can be correlated to exon sequence

24  variations—may very well have a broad scope, but this misses the point.  Rather, the relevant

---

[12] The Supreme Court has described the machine-or-transformation test as "a useful and important clue" of patent eligibility.  *Bilski*, 130 S. Ct. at 3227.  The Court has also stressed that it has "neither said nor implied that the test trumps the 'law of nature' exclusion."  *Prometheus*, 132 S. Ct. at 1303. To remain consistent with these statements, *Ultramercial* must be read to say only that the machine-or-transformation test is a useful clue to determine if a claim is meaningfully limited.

United States District Court

For the Northern District of California

question for preemption purposes is whether the claims of the '179 patent preclude others from making any practical use of these correlations.

All of the asserted claims require a primer pair to amplify an intron sequence. The complaint avers that at the time of the '179 patent's filing, numerous methods were available to analyze intron and exon sequences to detect genomic variations, none of which require primer pair amplification. (SAC at ¶ 28–31). Given the alleged availability of alternative methods of genomic analysis, clear and convincing evidence is lacking that the '179 patent impermissibly ties up the relevant field.[13]

2.  Insignificant pre- or post-solution activity

Even if a claim does not preempt all use of the natural law, it is not meaningfully limited if it contains only insignificant "pre- or post-solution activity—such as identifying a relevant audience, a category of use, field of use, or technological environment." *Ultramercial*, 722 F.3d at 1346. Agilent does not argue that the amplification step is insignificant pre-solution activity, nor does the limitation appear on its face to fall into any of the categories the Federal Circuit described. Consequently, there is not clear and convincing evidence the amplification step is insignificant pre-solution activity.[14]

3.  Overly generalized limitations

The steps of the '179 patent claims, as a whole, are not overly generalized. "[S]imply appending conventional steps, specified at a high level of generality, to laws of nature, natural

---

[13] Agilent remains free, of course, to challenge the availability or practicality of these alternative methods of analysis. *See Sequenom*, 2013 WL 5863022, at *11 (finding "great risk" the patent could preempt all use of a natural phenomenon where patentee produced no evidence of commercially viable alternatives). Such factual determinations, however, are inappropriate for a Rule 12(b)(6) motion. *See Ultramercial*, 722 F.3d at 1346 ("[W]hether a claim preempts 'too much' will often require claim construction and factual inquiries" inappropriate for a motion on the pleadings).

[14] In addition to the independent claims, several dependent claims purport to limit further the claimed methods. Agilent argues the limitations added by these dependent claims amount to insignificant pre- and post-solution activity. To grant Agilent's motion, each of the independent and dependent claims must fail, because "the question of eligible subject matter must be determined on a claim-by-claim basis." *Ultramercial*, 722 F.3d at 1340. Because the independent claims are not clearly directed at unpatentable subject matter, this order need not reach Agilent's arguments regarding the dependent claims. *See id.* ("Construing every asserted claim and then conducting a § 101 analysis may not be a wise use of judicial resources.").

United States District Court
For the Northern District of California

1   phenomena, and abstract ideas cannot make those laws, phenomena, and ideas patentable."

2   *Prometheus*, 132 S. Ct. at 1300.  For example, in *Prometheus*, the claimed steps simply told the

3   doctor "to determine the level of the relevant metabolites in the blood, through whatever process the

4   doctor or the laboratory wishe[d] to use."  *Id.* at 1297.  Similarly, the "analyzing" step of claim 1 of

5   the '179 patent simply instructs the scientist to analyze the amplified DNA sequence to detect the

6   allele.  ('179 patent at 59:65–66).  The step does not require any particular method of analysis or

7   explain how the allele is to be detected; such general instructions provide no direction to the

8   relevant audience and do not meaningfully limit the claim.[15]

9         The "amplifying" step, in contrast, is not overly generalized.  Instead of directing the

10  scientist to prepare the DNA for analysis by a method of his or her choosing, the step specifically

11  requires amplification using a primer pair that spans a non-coding sequence.  *Id.* at 59:59–64.  On

12  its face, this step provides sufficient direction meaningfully to limit the claim.  Because the

13  "amplifying" step provides adequate guidance, and because all the claim steps must be considered

14  as a whole, no clear and convincing evidence reflects that the '179 patent claims are overly

15  generalized.

16        4.    Machine-or-transformation test

17        The '179 patent claims do not, as a matter of law, fail the machine-or-transformation test.

18  Under that test, a claim may be meaningfully limited if: "(1) it is tied to a particular machine or

19  apparatus, or (2) it transforms a particular article into a different state or thing."  *See Bilski*, 130 S.

20  Ct. at 3234 (quoting *In re Bilski*, 545 F.3d 943, 954–955 (Fed. Cir. 2008)).  GTG argues the patent

21  claims require "primer pairs," which are "machines" because they are man-made tools used to

22  amplify DNA selectively.  (ECF No. 75 at 18–19 & n.15).  In addition, GTG maintains the claimed

23  methods transform naturally occurring DNA into man-made amplified DNA.

24

25

26  [15] The "analyzing" step contained in independent claim 9 is similarly overly generalized.  The step
    requires "analyzing said amplified DNA sequence to determine the presence of a genetic variation
27  in said amplified sequence to detect the allele."  ('179 patent at 60:25–27).  The additional
    instruction "to determine the presence of a genetic variation" provides no additional guidance to the
28  relevant audience.

United States District Court
For the Northern District of California

1    With respect to the machine prong, Agilent does not dispute a primer pair can constitute a

2 machine.  Rather, Agilent maintains the '179 patent defines "primer pair" too broadly to tie the

3 claimed methods to a "particular" machine.[16]  (ECF No. 78 at 9).  In support, Agilent relies on a

4 case which found the terms "'a network,' 'devices,' 'a machine-readable medium,' and 'a

5 computerized system'" failed to identify a specific machine.  *See OIP Technologies, Inc. v.*

6 *Amazon.com, Inc.*, C-12-1233 EMC, 2012 WL 3985118, at *13 (N.D. Cal. Sept. 11, 2012); *see also*

7 *CyberFone Sys., LLC v. Cellco P'ship*, 885 F. Supp. 2d 710, 716 & n.5 (D. Del. 2012) (finding the

8 term "channel" failed to identify a specific machine).  The term "primer pair" appears significantly

9 more restrictive than any of the rejected "machines" in *OIP Technologies*.  Consequently, Agilent

10 does not offer clear and convincing support that the term "primer pair" insufficiently identifies a

11 specific machine.

12    Agilent also disputes whether the claimed methods require a transformation, because the

13 amplified DNA is a nucleotide for nucleotide copy of the natural DNA.[17]  (ECF No. 78 at 8–9).

14 GTG responds that amplified DNA is chemically distinct and distinguishable from the naturally

15 occurring DNA from which it is derived.  (ECF No. 75 at 19; SAC at ¶ 27).  In particular, GTG

16 avers that a methylation present in most natural DNA is not copied to amplified DNA.  (SAC at ¶

17 27).  GTG does not provide any explanation why the absence of this methylation is important to

18 their claimed method.  However, considering the averment that the amplification step creates a

19 chemically distinguishable molecule, no clear and convincing evidence indicates an absence of

20 transformation.

21    In sum, none of *Ultramercial*'s considerations support a finding of clear and convincing

22 evidence that the '179 patent claims are not meaningfully limited.  The "amplifying" limitation

23 plausibly provides sufficient inventive concept to transform the unpatentable natural law into a

24 ─────────────

[16] "Primer pair," as defined in the '179 patent, means "a set of primers including a 5' upstream
25 primer that hybridizes with the 5' end of the DNA sequence to be amplified and a 3' downstream
primer that hybridizes with the complement of the 3' end of the sequence to be amplified." ('179
26 patent at 5:66–6:3).

[17] Agilent argues that, unlike cDNA, amplified DNA is not patent eligible under *Myriad*. 133 S. Ct.
27 at 2117–18. Even so, GTG does not purport to have patented the amplified DNA itself, but rather
methods utilizing amplified DNA. The Court in *Myriad* was careful to point out that its decision
28 did not reach any method claims or applications of natural laws. *Id.* at 2119–20.

1   patentable application of that law.  Whether the amplification step in fact meaningfully limits the

2   claimed methods is a question better addressed at a later stage of litigation.

3                                          V.      CONCLUSION

4          For the above reasons, defendant's motion to dismiss is denied.  Although the correlations

5   between genomic variations in non-coding and coding DNA sequences are unpatentable laws of

6   nature, Agilent has not shown by clear and convincing evidence that the '179 patent's claims are

7   not meaningfully limited applications of those natural laws.

8          IT IS SO ORDERED.

9

10  DATED: 3/7/14

11  _____

12  RICHARD SEEBORG
    United States District Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

No. CV 12-1616 RS
ORDER

13